FILED
2022 Apr-15  AM 10:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **GALINA YURIKOVA,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | |
| **DISABILITY REINSURANCE** | ) | |
| **MANAGEMENT SERVICES, INC.,** | ) | |
| **UNITED OF OMAHA LIFE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| **MUTUAL OF OMAHA** | ) | |
| **INSURANCE COMPANY AND** | ) | |
| **THE MUTUAL OF OMAHA LTD** | ) | |
| **PLAN** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |

## <u>COMPLAINT</u>

### Introduction

The Plaintiff, Galina Yurikova (hereafter "Ms. Yurikova") provides this as
her Complaint against Defendants for violations of the Employee Retirement Income
Security Act of 1974 ("ERISA"). The relief sought seeks The Mutual of Omaha LTD
Plan benefits, equitable relief, and statutory penalties.  Ms. Yurikova was employed
by the Mutual of Omaha Insurance Company ("Mutual of Omaha") and as part of
her compensation package she was a participant in The Mutual of Omaha LTD Plan
("LTD Plan").  The LTD Plan provided a benefit through a policy (number GLTD-
EH10) obtained by Mutual of Omaha from its subsidiary United of Omaha Life

1

Insurance Company ("United"). Ms. Yurikova filed a claim for LTD Plan benefits, which were paid for a time and then benefits were terminated. All decisions on the claim were made by Disability Reinsurance Management Services Inc. ("DRMS"). Ms. Yurikova appealed the termination of benefits, but DRMS failed to make a decision.

## Jurisdiction

1.      Jurisdiction is appropriate under 28 U.S.C. § 1331 in that 29 U.S.C. §1132(e) confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" as that term is defined within 29 U.S.C. § 1001, et. seq. The Defendants "may be found" within this district.

2.      An action under this subchapter brought in a district court of the United States, may be brought in the district where the plan is administered, or where the breach took place under 29 U.S.C. § 1132(e)(2). Breaches took place in this district when plan documents were not provided, where the claim record was only partially provided, and where plan decisions were due to be received.

## Factual Background and Benefit Information

3.      Ms. Yurikova was born in Russia in 1962. She was educated at Latvia University receiving a master's degree in food service and also in technology.

4.      She worked in the food service industry for a while, but then

immigrated to the United States and became a naturalized citizen.

5.      She knew she would need to work very hard in order to make a living in the United States, so she enrolled in Bellevue University in Bellevue, Nebraska, and obtained a bachelor's degree in computer programming.

6.      On January 5, 1998, she obtained a job with Mutual of Omaha working in the occupation known as Application Systems Analyst. This insurance company is a very large organization with 6,314 employees and in 2018, revenues of $9.347 billion.

7.      Ms. Yurikova's occupation required her to be responsible for development, maintenance, and integration of computer applications and systems, which was critical for this insurance company to operate. Nearly all employees in the company were dependent on their computers to perform their jobs.

8.      This occupation required Ms. Yurikova to act as an internal consultant, mentor more junior staff, ensure appropriate security and privacy measures to protect the company and customer data from intentional or accidental misuse, and utilize strong analytical and sound decision-making abilities. Vigilance and a high degree of cognitive thinking were required at all times while on duty. Ms. Yurikova and others in her occupation were required to be on call 24 hours per day, 7 days per week to address situations that might arise such as data breaches, system failures or application failures.

9.      The level of critical thinking for this occupation has been defined by the Department of Labor's resource known as O*Net, as being in line with judges, anesthesiologists, ophthalmologists, chief executives, and family medicine physicians.

10.      Active listening skills were also extremely critical, and again were in line with the skills required of judges, marriage and family therapists, social service workers, mental health counselors, and psychiatrists.

11.      Ms. Yurikova was well compensated in this occupation and she found her work very satisfying and fulfilling.

12.      Ms. Yurikova also was covered by a long-term disability benefit plan (LTD Plan) that promised to pay her a portion of her earnings if she became disabled from performing her own occupation. After 2 years, if she was disabled from performing any gainful occupation, benefits would continue until age 67. Any gainful occupation was defined as an occupation which suited Ms. Yurikova based on her education, training, and experience.

13.      The LTD Plan also had a limitation, which provided that if disability was due to a mental disorder, benefits would be limited to 12 months. The term "mental disorder" was limited to conditions or diseases regardless of their cause listed in the most recent edition of the International Classification of Diseases ("ICD") and the Diagnostic and Statistical Manual of Mental Disorders ("DSM").

4

14.     Based on information in a certificate of insurance, The LTD Plan benefit was through an insurance policy of one of Mutual of Omaha's affiliated companies, United. The certificate oddly states that United has discretion to make claim decisions, but that DRMS only has authority to *delegate* to third parties the right to make claim decisions. No documents were provided reflecting that DRMS or Mutual of Omaha delegated to DRMS's discretion to make claim decisions. DRMS is a company known to be aggressive in terminating or denying benefits and for conducting reviews that are not full and fair.

15.     DRMS is also known to utilize physicians who disregarded plan terms and had an undisclosed definition of disability, which excluded pain, despite the fact that the policy did require pain to be considered when an objectively verifiable diagnostic procedure verified a condition known to produce credible complaints of pain.

16.     The net result is that the LTD Plan, as interpreted by DRMS and its doctors, provided a largely illusory benefit given that DRMS, in excluding verified pain and given their aggressive tendencies, could deny any claim on a whim.

17.     Unaware of the nature of the claims management of DRMS and believing that her company had provided good benefits as represented, Ms. Yurikova had no other disability insurance other than through the Social Security Administration. She relied on the LTD Plan to provide the benefit due.

5

18.     However, if a Social Security disability benefit was received, the LTD Plan benefit was reduced dollar for dollar by that amount. A claimant was thus never able to obtain any compensation close to her former wages. It was not financially beneficial to cease work and rely on a long-term disability benefit.

19.     Ms. Yurikova enjoyed working her job for over 20 years when she began to have physical health issues.

20.     On September 7, 2018, she was admitted to the Methodist Health System emergency department and then to the hospital for chest pains, tightness and pressure. Concern existed that she had or was having a cardiac event.

21.     A treating cardiologist, Dr. Peters, ruled out myocardial infarction, but found her blood pressure remained elevated and spiked with any physical activity. She also was noted to have a history of incessant tachycardia that was resistant to beta-blockers. Beta-blockers are the first line of treatment typically known to reduce the frequency and severity of episodes. They failed here, as they do for some people.

22.     Ms. Yurikova continued in her work but her problems persisted. Her resting heart rate was between 120 and 130 beats a minute, which was causing a lack of blood flow to the brain. She experienced ongoing chest pain, leg pain with exertion, dizziness with standing, and lightheadedness.

23.     While Ms. Yurikova continued to work, she was followed periodically by Dr. Peters. She was struggling to perform her occupation and her symptoms

continued. She also began to experience a sleep disorder, loss of appetite, and fatigue. Lack of sleep deprived her of concentration needed for her occupation.

24.     By March of 2019 Ms. Yurikova was not able to fulfill her on-call job duties, she lacked the physical stamina to do her job, and she lacked clarity in her thinking to properly perform her job duties. As a result, she went out on leave under the Family Medical Leave Act (FMLA), to see if her symptoms would improve on medications and without the stress attendant with her occupation. Ms. Yurikova remained on FMLA leave based on these physical symptoms until she asked Dr. Peters to release her back to work in May 2019. However, her return to work failed and by August 8, 2019, her symptoms had worsened and she went back out on leave.

25.     The disabling symptoms experienced by Ms. Yurikova were classified as caused by physical issues and never were they diagnosed as a mental disorder under the ICD or DSM.

26.     Ms. Yurikova continued to pursue treatment but when her various conditions did not resolve she began seeking treatment from an additional physician by the name of Dr. Keller, a family medicine practitioner who is board certified and trained with the Mayo Clinic.  She hoped that a precise diagnosis and cure or path of therapeutic treatment would be received so that she could return to work.

27.     In August 2019, during these first two visits, Dr. Keller noted her symptoms along with muscle achiness, a racing heart while resting in bed,

exhaustion and significant trouble with dizziness.

28.     Ms. Yurikova was very frustrated over her inability to return to work and Dr. Keller noted that she was concerned and she began to experience depression secondary to the profound effects of insomnia, exhaustion, and palpitations. No ICD code for mental disorder, as defined in the policy, was ever noted by Dr. Keller for her disability.

29.     Ms. Yurikova saw Dr. Keller at least three times during the first month and on the last date she complained of sleeping only 2 or 3 hours, remaining exhausted throughout the day, persistent shortness of breath with any activity, and left chest pain whenever she took a breath.

30.     Ms. Yurikova also sought treatment from an endocrinologist, Dr. Taylon. She complained that she was having chest discomfort, shortness of breath, and numbness in her hands, loss of weight, inability to sleep, sweating and tachycardia. Ms. Yurikova's ongoing issues with chest pain, chest discomfort and numbness in her hands all correlate to cervical spine issues, such as radiculopathy, which was later diagnosed in January 2021, but undiagnosed at this point.

31.     Ms. Yurikova applied for long-term disability benefits in the fall of 2019. Ms. Yurikova was also required by DRMS to apply for Social Security disability, and she did so, although she hoped she would be able to return to work.

32.     Defendants agreed that Ms. Yurikova was disabled, but for some reason

determined that her disability was subject to the mental disorder limitation in a letter dated December 24, 2019. Despite this adverse finding, Defendant did not provide Ms. Yurikova notice that she could challenge that finding with an appeal. DRMS paid the long-term disability claim benefit as of February 4, 2020, the first day after the elimination period. From August 2019 to February 2020, she had received short-term disability benefits.

33.     This opinion of DRMS was puzzling as throughout 2019, Ms. Yurikova had 17 different medical visits scattered among 7 different medical providers all attempting to diagnose Ms. Yurikova's problems and provide treatment or a path to recovery. She only had two visits with a psychiatrist in 2019, out of the 17 total treatment visits.

34.     Ms. Yurikova, exasperated over not recovering her health, also went to a psychiatrist to see if that would help. He did not opine that Ms. Yurikova was disabled solely due to a mental disorder.

35.     A DRMS internal nurse, however, noticed that there was not a mental disorder ICD or DSM code in the file. Without such a code in the records, DRMS would lose its opportunity to limit benefit payments to one year. The attending physician statements provided by Dr. Keller listed the impacting issues on her functionality as chest pain, severe insomnia/ depression, headaches and dizziness. The ICD codes provided with those diagnoses <u>were not mental disorder ICD codes</u>.

36.    This did not stop the DRMS nurse, however, and she recommended altering the diagnoses in company records, by adding an ICD code, which was a mental and behavioral disorder code. No physician provided that code and it is unethical to make a mental disorder diagnosis without a personal examination according to the American Psychological Association Ethics Code. This was inappropriate conduct for a claim fiduciary, and further, this nurse was also not qualified to render a medical opinion.

37.    In 2020, Ms. Yurikova went to 28 different medical appointments, scattered among 9 different medical providers. Not once did any physician examining Ms. Yurikova ever find her disabled due primarily to a mental disorder listed in the ICD or DSM.

38.    The psychiatrist, Dr. Goodman, made clear in 2020, that chronic physical issues were the root cause of Ms. Yurikova experiencing depression and that her depression would not resolve until those physical issues could be resolved.

39.    Also, during 2020, Ms. Yurikova underwent physical therapy and her pain was well documented during those physical therapy visits. She was exhausted and required bed rest after these visits. Ms. Yurikova had severe degenerative disc disease, which was causing her pain in her arms and numbness in her hands. She also had problems with her left shoulder. Therapy would hopefully reduce those issues, but it was not successful after 11 visits in 2020.

10

40.     Other problems persisted for Ms. Yurikova, such as tachycardia, but remained difficult to treat. The focus was on the treatable issues. These problems with her neck, arms, numbness in her hands, and left shoulder pain, precluded her from typing on a keyboard for more than 10 minutes at a time. Answers for those issues were sought.

41.     However, DRMS was predisposed and determined to terminate Ms. Yurikova's benefit regardless of the truth and policy terms. However, those within the company desired to wait to terminate benefits until Ms. Yurikova obtained her Social Security disability benefit, so the overpayment might be collected first. DRMS believed a decision would be soon. DRMS would seek to obtain back LTD benefits, which became overpaid benefits given that Social Security disability would be retroactively paid and the offset of those benefits would also retroactively reduce the LTD benefit. After obtaining that money, DRMS would proceed to terminate the benefit.

42.     The problem for DRMS was that Dr. Goodman, the psychiatrist, indicated that depression was not the root issue, but rather the physical conditions were causing her pain and creating secondary depression issues. Thus, Dr. Goodman did not feel that extensive treatment for depression was warranted until the physical issues were remedied. This was aggravating to DRMS as it posed an obstacle to terminate benefits.

11

43.    DRMS sent an attending physician statement then to Dr. Keller in January 2021, and he opined that Ms. Yurikova was disabled from sedentary employment. This further aggravated the DRMS nurse.

44.    The DRMS nurse then sent a fax in February 2021, urging Dr. Keller to find that Ms. Yurikova's physical problems did not preclude mere sedentary employment.

45.    However, Dr. Keller firmly disagreed with this and stated that Ms. Yurikova was disabled from physical problems. He noted she had been diagnosed with cervical radiculopathy. Dr. Keller, after over a year's worth of examinations, had seen a consistent display of symptoms indicating that Ms. Yurikova had cervical radiculopathy, and now this had been confirmed by another physician.

46.    The evidence was mounting against DRMS's plan to terminate benefits. Dr. Keller referred Ms. Yurikova to Dr. Treves, who was a respected neurosurgeon and spine specialist. After an MRI was performed, he read that to reveal moderately severe bilateral foraminal narrowing at C5–C6 with a disc osteophyte abutting the cord, causing modest central stenosis. He believed that spinal cord compression was occurring due to the consistent numbness in Ms. Yurikova's hands and arm pain, especially in her left arm.

47.    Dr. Treves performed several objective examination maneuvers to verify this, such as testing her left shoulder range of motion, which was found to be

poor. The left arm was at a production of less than 90°, which corroborated the pain complaints. She exhibited a positive left-sided empty can test, which is used to assess the supraspinatus muscle and supraspinatus tendon. A positive test reveals neuropathy (damage) to the suprascapular nerve. Spurling's maneuver was positive bilaterally. A positive result indicates nerve root compression. These were objective indications confirming the complaints of pain and symptoms described by Ms. Yurikova.

48.     Dr. Treves assessed Ms. Yurikova as having neck pain, headaches, and left shoulder pain along with left radiating left upper extremity pain and paresthesia, bilateral thumb pain, central disc degeneration, and spondylosis, which was most involved at C5–C6. She was also diagnosed as having thoracic kyphosis (a physically exaggerated forward rounding of the back). Disc degeneration is known to worsen thoracic kyphosis and worsens the pain and discomfort associated with kyphosis.

49.     Ms. Yurikova did not want to proceed immediately with neck surgery and so she underwent further rounds of physical therapy. The therapist noted that merely placing her arms in sleeves was very painful and slow. Complaints of pain in her neck, headache pain, shoulder pain and radiating pain and numbness in her left arm and bilateral pain in her hands was well documented throughout the therapy notes in 2021.

50.     Ms. Yurikova also had reoccurrences of tachycardia and hypertension, which remained difficult to treat. Ms. Yurikova's cardiologist, Dr. Peters, continued to document these issues.

51.     Dr. Treves referred Ms. Yurikova to an orthopedic physician, Dr. Hutton, to evaluate her shoulder pain, which was thought to be a separate physical problem not stemming from these cervical issues. On March 3, 2021, Dr. Hutton determined that Ms. Yurikova had rotator cuff tendinitis in her right shoulder, calcific tendinitis with secondary adhesive capsulitis in the left shoulder. He advised to continue with physical therapy.

52.     In March 2021, Ms. Yurikova received notice that Social Security disability was paying her disability claim actively back to February 2020. She immediately faxed this information to DRMS on March 5, 2021.

53.     DRMS calculated the overpayment contending it was approximately $20,000 and Ms. Yurikova promptly provided the money from the Social Security back payment.

54.     DRMS, however, still fully intended to terminate the claim as of February 4, 2021, based on the mental disorder limitation, and notwithstanding that there was no evidence that the mental disorder limitation was the cause of her disability on that date. DRMS sent a letter dated May 5, 2021, retroactively terminating Ms. Yurikova's LTD benefit as of February 2, 2021. It represented in its

letter that this was based on the findings of a "medical consultant".

55.    The findings of the medical consultant were that the overall level and intensity of treatment for the reported physical conditions did not rise to a level of functional impairment. It would be expected that she would be evaluated on a regular basis instead of PRN, or as needed, and she would be referred for additional evaluation and treatment if her conditions rose to the level of impairment. Therefore, the medical consultant opined that Ms. Yurikova would be able to perform her own occupation of sedentary level work as of February 2, 2021.

56.    This was baffling to Ms. Yurikova. Her condition had not improved and in fact, she had 71 different treatment visits from January 2021 through July 2021, scattered among nine different medical providers. Her physical condition was deteriorating.

57.    By May 1, 2021, she had seen her family medicine physician, Dr. Keller two times (with another appointment set just days later); Dr. Treves, the neurosurgeon one time; Dr. Hutton, the orthopedist, two times; Dr. Goodman, her psychiatrist three times; Dr. Morrel a psychologist one time; Dr. Peters, her cardiologist one time; and she had eight physical therapy visits, which were ongoing.

58.    The reason asserted for terminating the claim was nonsensical and wrong, and so Ms. Yurikova obtained counsel.

59.    Counsel immediately sought for Ms. Yurikova the complete claim file,

15

and all plan documents beginning July 13, 2021. A partial claim record of 855 pages was received. Upon review it was learned that the "medical consultant" was only a DRMS nurse, and that there was actually no true medical opinion from a physician. No one trained to provide an accurate assessment as to what constituted reasonable and necessary care provided an opinion. The DRMS nurse was not able to obtain medical opinions, and so regardless of the truth and policy terms on the definition of mental disorder, proceeded with executing the game plan of DRMS and provided the sole opinion upon which the claim termination was based. DRMS was intent to limit benefits to one year and then obtain much of that money back through the Social Security overpayment.

60.     Mutual of Omaha failed to produce any documents as the employer and the potential plan administrator. It referred the request for plan documents to DRMS. DRMS refused to produce anything more than the certificate of insurance, although it contended it had produced the policy in its letter of August 5, 2021. That was not true as a review of the 855 pages revealed.

61.     The Department of Labor maintains a website of form 5500 filings in which an employer identifies the plan administrator for benefit plans. Mutual of Omaha is identified in those filings.

62.     Given DRMS's insistence that United was the plan administrator, a second request for all plan documents was again sent to both DRMS and United,

16

dated August 10, 2021. Again demand was made for the full plan document, the claims manual, and the summary plan description. DRMS responded on August 19, 2021, and stated that United was the plan administrator, and it was responsible for the plan document request. It had forwarded Ms. Yurikova's request through counsel for all plan documents to United. No response was ever received from United, and none of the Defendants ever provided an exhaustion of remedies process for statutory penalty claim.

63.     Over the rest of 2021, and after the claim termination, Ms. Yurikova continued with needed care, which included ongoing visits to Dr. Keller, Dr. Hutton, a second orthopedic surgeon Dr. Longley, and physical therapy. She remains unable to function in any sedentary employment due to neck pain, arm pain, and numbness in her hands. These problems preclude her from keyboarding for more than about 10 minutes. Even during those 10 minutes she is only capable of typing about 10 to 15 words per minute.

64.     On October 21, 2021, Ms. Yurikova presented an appeal specifically challenging the reasons that DRMS terminated Ms. Yurikova's LTD benefit. Ms. Yurikova pointed to an obvious conflict of interest and biased and unfair claims handling, and this predisposition to terminate the claim after receiving the Social Security overpayment monies.

65.     It was noted particularly that Defendant failed to consider the bimanual

17

dexterity issues that were required for Ms. Yurikova's occupation. She was required to engage in keyboarding at least 6/8 hours a day and she was further required to sit constantly throughout the day for her occupation. Ms. Yurikova clearly was not capable of either of these requirements. Also, the pain was causing insomnia, and with little sleep (2 to 4 hours), she struggled to think clearly for the time required in her work.

66.    The appeal also particularly noted that Defendant failed to utilize a reasonably qualified medical expert. Further, DRMS did not provide a discussion as to why it was disregarding the clear findings of Dr. Keller restricting Ms. Yurikova from sedentary work due to physical conditions. This was a violation of the law, but it was also a violation of the claim manual of DRMS.

67.    Further, it was noted that there is no challenge to the frequency and necessity of the medical care obtained by Ms. Yurikova, and thus, vocationally she was not capable of remaining employed on a full-time basis after attending at least 28 medical visits in 2020 and seeing that increase to over 71 medical visits in 2021 through July. Just the medical visits alone would constitute an average of at least 10 absences from work per month. There is no vocational evidence that any employer is willing to tolerate more than one or two absences per month with a full-time position.

68.    Additional evidence was submitted with the appeal, including a report

from a physician who independently examined Ms. Yurikova. He found Ms. Yurikova restricted from performing a sedentary occupation due to inability to keyboard, as well as sit and stand long enough to perform her occupation. He found pain to be corroborated and the complaints credible and noted this would distract her from performing her occupation. Additional medical records were provided from Dr. Keller, Dr. Peters, Dr. Hutton, Dr. Treves, Dr. Longley, and physical therapy.

69.     Additionally, it was noted that DRMS did not obtain the Social Security record, despite requiring Ms. Yurikova to sign a Social Security authorization, requiring Ms. Yurikova to file for Social Security and then receiving the financial benefit of the Social Security overpayment.

70.     The appeal demanded that DRMS provide good cause as to why the claim should not be deemed exhausted due to violations of the full and fair review laws. The appeal gave an ample 21 days to provide that good cause. The failures were as follows:

a.     The decision did not provide any adequate basis to explain why Dr. Keller's opinion was due to be disregarded in favor of a DRMS nurse employee.

b.     The termination of benefits letter was required to provide the type of evidence that was required in order to see the claim paid.

c.     The entire claim record was required to be provided. The record was sanitized of many internal communications and most matters pertaining to

calculations of benefits. Further, communications with any vendor were not in the claim record.

      d.    The duty of honesty had been violated due to the changing of company records by the DRMS nurse as to the diagnostic codes, and switching the primary diagnosis from physical conditions to a mental disorder, when in fact this was not what treating physicians had provided.

      e.    DRMS neglected its duty to investigate by refusing to obtain the Social Security claim record, given that this would necessitate a delay in terminating the benefits it was predisposed to terminate.

      71.    After having received the appeal, DRMS remained predisposed to stand by the termination of this claim. A decision on the appeal was due within 45 days, which would be December 5, 2021.

      72.    DRMS began a strategy then to delay making a decision on the appeal, in order to develop some means of defending its claim termination.

      73.    First, despite DRMS being aware of Counsel's email and facsimile number, DRMS mailed a Social Security authorization by letter dated November 5, 2021. The letter was not placed in the mail until on or after November 8, 2021, given the date postage was affixed. It was not received until November 16, 2021. This was an effort to toll the timeframe for making a decision. A request for information from the claimant permits tolling.

74.     However, the ruse was immediately recognized, and a two-page letter dated November 16, 2021, was immediately sent by facsimile to DRMS. The letter should have been sent by facsimile, although this was not a necessary authorization. Also, good cause had not been provided within 21 days for the claim procedure violations. Counsel required that in the future all letters should be sent via facsimile or email. As a matter of law the claim had been deemed exhausted, due to failure to provide good cause.

75.     The claim file had 18 copies of the signed Social Security authorization already in it, so requesting another Social Security authorization to be signed was clearly a ruse to delay the decision. Further, DRMS implied that it would also toll the timeframe for making a decision in order to receive the Social Security record. That could take several months and obtaining the Social Security record is a matter that should have been taken care of during the claim process. Delaying to obtain the record during an appeal when it should have been utilized in connection with the original claim decision prejudices Ms. Yurikova, who was not receiving LTD benefits. The law does not allow a claims administrator to delay decision-making for this reason.

76.     Ms. Yurikova was also mindful of constraints on the judicial system and so rather than proceed to file suit, which was her right, Counsel sent Ms. Yurikova's copy of the Social Security record on November 17, 2021, in hopes that

a prompt decision would be made without the necessity of filing a lawsuit.

77.    DRMS did not make a decision by December 5, 2021, when it was due. The claim was thus again due to be considered deemed exhausted. However, Counsel did not proceed with filing a lawsuit immediately in case DRMS had mailed a letter again.

78.    On December 16, 2021, DRMS sent by facsimile, a letter providing a copy of the report of its medical consultant Dr. Stewart Russell, who had performed a review on December 7, 2021. DRMS had delayed nine days after receipt of this report to provide that to counsel. This was inexplicable given that DRMS was required to provide new evidence and new rationales to Defendant's claim termination with ample time for Ms. Yurikova to review and provide a response. The report and letter combined were 51 pages.

79.    DRMS contended that its decision was not due until December 16, 2021, because it was permitted to toll the timeframe from November 5, 2021, until it received the Social Security authorization signed by Ms. Yurikova on November 16, 2021. Thus, it was permitted to add 11 days. This again was a ruse since the letter was not mailed until November 8, 2021, and tolling could not commence until the letter was actually mailed. The tolling could only be argued to permit eight days. That would be December 13, 2021. The Social Security authorization also was not necessary DRMS did not play its own game properly.

80.     Nonetheless, Ms. Yurikova remained mindful that if she proceeded with litigation the Court may well remand the matter with a reprimand to DRMS that it should stop playing these games and fairly evaluate the claim. That would delay her relief. Accordingly, Counsel sent a letter dated December 21, 2021, advising that Ms. Yurikova would respond to avoid going through a remand in litigation. However, ample time would be required given the length of the report.

81.     DRMS, however, given its neglect to provide the report on December 7, 2021, and waiting until December 16, 2021, left itself no additional days to decide the claim after a response was provided.

82.     The response to Dr. Stewart Russell's report was provided on February 24, 2022. His report was entirely discredited noting numerous errors and false and unsupported assumptions. He had criticized Dr. Keller's restrictions and limitations finding Ms. Yurikova incapable of sedentary employment by contending that this had to mean that Ms. Yurikova was confined to bed. This criticism was based on the DRMS form, which was intentionally misleading as it does not provide a response for less than sedentary physical ability.  Dr. Keller had astutely picked up on that and provided an accurate response as to restrictions and limitations. Nonetheless, Dr. Keller provided another report with a full and complete response, noting the forms deficiencies and indicating that Ms. Yurikova was physically restricted from performing a sedentary occupation going back to January 2021, and through the

present date. This refuted the criticism completely.

83.    Further, a functional capacity evaluation was provided, which independently confirmed that Ms. Yurikova could only keyboard at the rate of about 10 to 15 words per minute, and she could not maintain the position her arms needed to keyboard for more than 10 minutes. She could not be competitively employed at that typing rate and with the limitation of 10 minutes. It was also documented that she could not sit continuously.

84.    Additionally, another report from the independent occupational physician, Dr. Robert Ross, was provided a report strongly criticizing the misstatements in Dr. Russell's report, and confirming the reliability of the FCE.

85.    Finally, a report of an independent vocational consultant, Ms. Ashley Johnson, was provided confirming that based upon the records of all treating physicians, as well as the report of the independent examining physician, and an FCE, Ms. Yurikova was unquestionably disabled from sedentary employment.

86.    Given that DRMS failed to reserve any time for it to make a decision with its failure to promptly submit the report from Dr. Russell, Ms. Yurikova expected that a decision would be forthcoming immediately or at least within a few days.

87.    Instead DRMS waited until March 3, 2022, to respond and contended that it was taking an additional 45 days beginning February 24, 2022.  Ms. Yurikova

challenged this saying that it is not within the regulations, but again considering that a Court might remand this matter to permit such, she grudgingly determined she would wait until April 10, 2022, for the promised decision.

88.     DRMS next sent a letter dated March 14, 2022, submitting another report from Dr. Russell, which he completed on March 10, 2022. He made no response to the report from Dr. Keller, nor the independent examining occupational physician, nor the vocational evaluation. He only provided a response regarding the functional capacity evaluation, and he basically found the evaluation to be accurate, but only criticized the FCE as being roughly 8 months after the claim closure which reflected more deconditioning. This was obviously inaccurate as Dr. Longley's record in May 2021, previously noted Ms. Yurikova's inability to keyboard for more than a few minutes, as did Dr. Keller's records back near the time of the claim closure in early 2021. Further, the independent examining physician, Dr. Ross had also noted this restriction.

89.     Counsel for Ms. Yurikova learned that Dr. Russell had his deposition taken, and his testimony revealed that he considered anyone capable of watching TV at home, to be capable of sedentary employment. He further opined that claims of extreme fatigue and pain would not impact the ability of an individual to perform sedentary work, which indicates that he ignores pain. The only real exceptions that he found to performing sedentary work would be individuals who are paralyzed,

have had their hands cut off, or are psychiatrically impaired. He dismissed out of hand patient complaints of pain and also dismissed treating physician restrictions and limitations based on conditions known to cause pain. It was further revealed in that testimony that he derives the majority of his income from DRMS, with a close second involving his work with Unum.

90.    It was further learned that there is a specific individual at DRMS with whom he maintained contact to expedite and facilitate such reviews. Dr. Russell's opinions are thus known to DRMS, and he is sought out to provide those opinions to support claim terminations. United and Mutual of Omaha are also aware that DRMS utilizes physicians such as Dr. Russell regularly in order to support claim terminations. It is further aware of the unfair and abusive claim practices of DRMS.

91.    The deposition of Dr. Russell was submitted to DRMS on March 16, 2022, along with the letter noting that the FCE was consistent with the earlier physician opinions back in January 2021 and thereafter, and thus, Dr. Russell's criticism had no validity.

92.    DRMS insisted that it still had until April 10, 2022, to make a claim decision, and so Ms. Yurikova also provided this recent report of Dr. Russell to the independent physician who had examined her for his review, Dr. Ross.

93.    The report of Dr. Ross was submitted April 6, 2022, as a further response to the recent report of Dr. Russell. It found that given Dr. Russell's views

as stated in his deposition, his opinions were not reasonable nor reliable. Dr. Ross is an expert on standards for evaluating impairment. He has engaged in conducting physical examination of individuals for several decades and has done so both for insurance companies, employers and claimants. He is currently employed with University of South Alabama. He possesses expertise regarding the evaluation of impairments.

94.     The report noted that under any reasonable standard for evaluating impairment, pain must be taken into account. The report reviewed several standards, including the Social Security standard, the AMA Guides Evaluation of Permanent Impairment, and peer reviewed medical articles documenting other clear standards.

95.     DRMS was aggravated that Dr. Russell had been entirely refuted and discredited, so it then sought another review on April 7, 2022, and apparently it was obtained on April 8, 2022, and then submitted to Ms. Yurikova's Counsel on April 8, 2022. That review was submitted just before the deadline in order to force another extension of time from the October 2021 appeal, given the decision was due to be made on April 10, 2022. By allowing a response, DRMS believed this tolled the time.

96.     Counsel responded to the review by a physician named Dr. Johnson, and learned he was a coworker with Dr. Russell at Unum.  Dr. Johnson's opinion failed to refute the opinions of Dr. Keller, and the independent physician Dr. Ross,

and clearly misunderstood the FCE, vocational report, and medical record of Dr. Longley. This report was refuted on April 12, 2022, ending the argued tolling by DRMS. This left two days for DRMS to make a decision. DRMS did not make a decision on April 14, 2022.

97.    DRMS is engaged in a clear pattern and practice of delays and predisposition to support its claim termination regardless of the truth.

98.    The claim has been deemed denied and the claim process has been exhausted and certainly has been deemed exhausted repeatedly. Additionally no exhaustion remedy was provided for a statutory penalty claim, nor for any breach of fiduciary duty claim.

99.    United and Mutual of Omaha are acting contrary to their fiduciary duties by using DRMS to make claim decisions given these known issues.

100.    Ms. Yurikova is entitled to her past benefits and ongoing benefits in the future, as her condition will continue to decline, injunctive equitable relief is necessary to preclude DRMS from serving as the claims fiduciary, or in the alternative, that DRMS be precluded from utilizing its nursing employees to provide medical opinions under the guise of "medical consultant", which is misleading to claimants, and from utilizing physicians that are solely utilized by insurers to provide predetermined opinions ignoring pain verified by conditions.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Ms. Yurikova respectfully requests this Court find jurisdiction and venue appropriate, and grant the following relief:

a.      For an order against all Defendants awarding Plaintiff all benefits due and owing in accordance with the terms of the LTD Plan identified in this Complaint, as well as all interest due thereon at 12% as permitted by law and equitable principles pursuant to 29 U.S.C. § 1132(a); and

b.      For a judgment against Defendants awarding Plaintiff all costs and reasonable attorney's fees incurred connected to the prosecution of and pursuit of relief in this action as permitted under 29 U.S.C. § 1132(g)(1); and

c.      For this Court to exercise its discretion to award statutory penalties of up to $110 per day against DRMS as *de facto* plan administrator and/or United and/or Mutual of Omaha regarding the refusal to provide all plan documents (main plan document, documents delegating discretion, claim manuals, and the policy) and any other instruments used to operate the plan; and

d.      For other equitable relief, including injunctive relief precluding Mutual of Omaha and United from utilizing DRMS given the adversarial abuses during the claim process which are contrary to fiduciary duties. In the alternative, injunctive relief is sought against DRMS utilizing physicians who are known to only provide reviews for insurance companies and who are known to ignore pain relating to

29

conditions known to cause pain; and

    e.      Such other relief as may be deemed equitable, just and proper.

Respectfully submitted,

David P. Martin (ASB-3500-M68D)
**The Martin Law Group, LLC**
**Attorney for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402
Phone (205) 343-1771
Facsimile (205) 343-1781
david@erisacase.com

**Plaintiff's Address:**

Galina Yurikova
c/o The Martin Law Group, LLC
PO Box 20087
Tuscaloosa, AL 35402

**Defendants' Addresses:**

Disability Reinsurance
Management Services, Inc.
CT Corporation System
2 North Jackson Street, Ste. 605
Montgomery, AL 36104

United of Omaha Life Insurance Company
The Prentice-Hall Corporation System, Inc.
641 South Lawrence Street
Montgomery, AL 36104

Mutual of Omaha Insurance Co.
The Prentice-Hall Corporation
System, Inc.
641 South Lawrence Street
Montgomery, AL 36104

The Mutual of Omaha Ins. Co. LTD Plan
c/o Mutual of Omaha Insurance Co.
The Prentice-Hall Corporation System, Inc.
641 South Lawrence Street
Montgomery, AL 36104